UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN,
SOUTHERN DIVISION

| | |
|---|---|
| BRANDON ASTRAUCKAS and JULIE HLYWA, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. ) |
| GRETCHEN WHITMER, in her official capacity as Governor of Michigan, | ) ) ) ) **Jury Trial Demanded** ) |
| Defendant. | ) |

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

**INTRODUCTION**

We live in extraordinary times. For the first time in American history, a Governor suspended the Constitutional liberties of her state's citizens, proclaiming an "emergency" exception to the Bill of Rights. This case harbors no precedent. Indeed, the closest precedent is a case that lives in infamy: *Korematsu vs. United States*, 323 U.S. 214 (1944), unanimously overturned by *Trump v. Hawaii*, 585 U.S. (2018). The Plaintiffs seek to protect their rights safeguarded under the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution in this legal action for declaratory and injunctive relief against GRETCHEN WHITMER in her official capacity as the Governor of the State of Michigan (the "Governor") arising out of her unlawful Executive Orders No. 2020-21 and No. 2020-42. The Governor placed the Plaintiffs, and most of Michigan, under mass house arrest, without inclusion of Constitutional activities as essential services, and by taking property rights without due process

1

of law or just compensation. The Governor's predicate for state action is without compelling evidence just as the means taken are not narrowly tailored.

## PARTIES

1. Plaintiffs BRANDON ASTRAUCKAS and JULIE HLYWA are a married couple who are residents of the city of Grosse Pointe Farms, in Wayne County, Michigan. They own a waterfront cottage on Torch Lake in Kalkaska County, Michigan, that they rent to vacationers.

2. Defendant, GRETCHEN WHITMER, named in her official capacity, is the Governor of the State of Michigan, is responsible for enforcing the laws of the State of Michigan, and is charged with implementing policy through executive orders, including the Executive Orders that took effect on March 24, 2020 and April 9, 2020.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.

4. Plaintiffs' claims for declaratory and injunctive relief are authorized by 42 U.S.C. §§ 1983, 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court.

5. Venue is proper in this District under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs claims occurred in this judicial district.

## FACTS

**The COVID-19 Pandemic**

6. COVID-19 is an infectious disease affecting the respiratory system, which was first identified in 2019, in Wuhan, China. Since then, it spread globally and is now present in all 50 states.

7.     Historically, no virus infects more than a small percentage of the population in an infected area over a short time period. The worst virus to hit this country in the last century, the Spanish Flu, required three years and multiple variants to even reach a third of the population in a given area.

8.     The COVID-19 virus spreads through close, continuous contact in confined quarters via respiratory droplets produced when people cough or sneeze, but is not generally airborne, and more than 80% of people will not get infected even when exposed. The evidence shows the risk of death from infection of the virus transmitted to people while driving, transmitted in open air in public parks or on public streets, transmitted while shopping in stores or restaurants, or transmitted anywhere outside a confined setting, is negligible to non-existent, and substantially less than dying or suffering serious injury from a car accident, bike accident, or from medical error.

9.     Amongst the small minority of people infected, many will be asymptomatic. Amongst the very few who get infected and ill, all but a small minority will suffer no disabling or debilitating conditions or symptoms. The risk of death from the virus for the working age population under 65 years of age without serious underlying medical conditions is less than the risk from driving a car for a year on American streets and highways.[1]

10.    There is no evidence that house arrest, intra-state travel bans, prohibitions on purchases of gardening seeds or American flags, prevention of people staying at two different homes they own, drive-in church services, rental property businesses, or public rallies employing social distancing techniques, substantially reduces the risk of infection for those vulnerable to disabling

---

[1] https://www.livescience.com/death-rate-lower-than-estimates.html

illness or death. Meanwhile, there is substantial evidence that locking people up in confined quarters, compelling continuous close contact with others, poses the greatest risk of infection to those most vulnerable.

### Executive Orders No. 2020-21 and No. 2020-42

11. On March 24, 2020, Governor Whitmer issued Executive Order No. 2020-21 requiring all citizens of the State of Michigan to stay at home or at their place of residence except when leaving to obtain "essential" items, which the Governor limited to certain foods, prescriptions, and limited forms of health care.

12. Executive Order 2020-21 is described as a "[t]emporary requirement to suspend activities that are not necessary to sustain or protect life." A true and correct copy of this order can be found at https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-522626--,00.html.

13. The order limited gatherings and travel, and required workers who the Governor unilaterally determined were "not necessary to sustain or protect life" to stay under house arrest.

14. The Governor rescinded the order on April 9, 2020, and replaced it with Executive Order No. 2020-42, (the "Order"), which is in effect until May 1, and went further in restricting the movement of Michigan residents. A true and correct copy can be found at https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-525182--,00.html

15. Order 2020-42 suspends almost all Constitutional liberties for the citizens of Michigan and effectively declares an "emergency" exception to the Bill of Rights by failing to identify the exercise of core Constitutional rights as essential activities, thereby depriving citizens of the right to free expression of religion, political association, public assembly, circulating petitions (including recall petitions) by most effective means, the right to privacy, the right to travel, the

right to practice one's profession, vocation or occupation, and the right to property protected by due process of law and just compensation for any taking thereof.

16. For example, the order forbids residents from going to a neighbor's home to visit or inviting a neighbor into one's own home.

17. The current order also states that travel between two residences is not permitted. For example, residents aren't allowed to travel from their primary residence in Southeastern Michigan to a Northern Michigan vacation home.

18. Order 2020-42 further prevents any property owner from renting or leasing his or her property for anything other than providing critical infrastructure.

19. Under Order 2020-42 the Plaintiffs have been prevented from exercising some of their most fundamental rights enjoyed by citizens of the United States and the State of Michigan.

20. Under threat of fines and criminal penalties the Plaintiffs are prohibited from traveling freely within the State of Michigan, visiting family and friends, and attending to or utilizing their privately owned property for the duration of Order 2020-42.

21. Order 2020-42 imposes severe fines and criminal penalties for any resident of the State of Michigan operating out of compliance with the Order.

22. Notably absent from Order 2020-42, or any other executive orders issued by Governor Whitmer, is any provision addressing the inherent financial burden inflicted by the Orders on individuals and businesses throughout Michigan as a direct result of the mandated shutdowns.

23. Governor Whitmer's restrictions on businesses began on March 24, 2020, and were extended on April 13, 2020. Order 2020-42 will remain in effect until May 1, 2020, and as of the filing of this Complaint, it remains in effect.

24.     Order 2020-42 requires Plaintiffs' Torch Lake vacation home to sit idle at a time when it normally would be rented out to generate revenue for Plaintiffs.

25.     One renter has already cancelled ($2,400 lost). At least three others have asked to have payments delayed ($15,000-$20,000 in potential lost rental income). If Governor Whitmer's order gets extended to mid-May or June, Plaintiffs expect to lose $30,000 to $40,000. Last year, Plaintiff's rental income was $60,000.

26.     Plaintiff's can't prepare their vacation home for the summer rental season, for example, painting and adding mulch, rocks and flowers.

27.     Plaintiff Hlywa's law practice, which includes family and criminal law, has been impacted. For example, she can't meet with clients in person or access files and materials in her office. She's lost income since cases have been adjourned as far out as July.

28.     Despite issuing Orders 2020-21 and 2020-42 under the pretext of taking for a public purpose, Governor Whitmer did not provide compensation for those who suffered substantial – and perhaps total – diminution of value in their property interests as a result. Orders 2020-21 and 2020-42 by their operative provisions deprived Plaintiffs of all economically beneficial use of their property.

29.     Orders 2020-21 and 2020-42 constitute a regulatory taking implemented for a recognized public purpose, and therefore the failure to pay just compensation contravenes the Takings Clause of the Fifth and Fourteenth Amendments. *Coalition for Gov't Procurement v. Fed. Prison Indus.*, 365 F.3d 435, 478, (2004) see also *Horne v. Dep't of Agric.*, 576 U.S. 350, 135 S. Ct. 2419, 2426 (2015) ("Nothing in the text or history of the Takings Clause, or our precedents, suggests that the rule is any different when it comes to appropriation of personal property. The Government has a categorical duty to pay just compensation when it takes your

car, just as when it takes your home.").

## AUTHORITY

30. Governor Whitmer justified her authority to enact the Orders by citing a set of broad emergency statutes that she said authorized her actions to stem the spread of COVID-19 across the State of Michigan.

31. Notwithstanding their purported public purpose, Governor Whitmer's Orders halted all economic activity and violate fundamental rights protected by the Constitution of the United States and the Constitution of the State of Michigan.

32. The Governor failed to substantiate any evidence to compel her actions taken served any compelling public purpose. The Governor failed to substantiate any evidence to compel her actions taken were narrowly tailored to alternative courses of action she could have taken. This is because no evidence supports the Governor's actions, taken without precedence or justification.

33. There is no evidence the Governor's actions will significantly reduce the risk of excess deaths in Michigan, nor that her chosen course of actions would achieve those ends better than policy alternatives available to her, including social distancing rules for the engagement of social activity and special protections for those most vulnerable, such as the elderly and those with underlying at-risk medical conditions.

34. There is evidence the Governor's actions will cause substantial and irreparable harm, aside from and beyond the harm to civil liberties, economic opportunity, and the pursuit of happiness they incalculably inflict, including harm to the physical and mental health of hundreds of thousands of people in Michigan, including increasing risk of higher suicides, stress-induced deaths, and shorter life expectancy. The trade-off of sacrificing quality of life for quantity of life the Governor claims as her pretextual predicate for her unprecedented monarchial claims of

power over the state's citizens endangers those citizens more than it safeguards them, by every material metric.

35. The Governor failed to obtain approval within the tricameral protections of separated powers of government, as the legislature did not approve her actions nor did the judiciary assent to them, while the public never obtained any participation rights in the process at all. Meanwhile, their protest and petition rights are stripped, stopped or seriously circumvented.

36. The methodological approach of the Governor included over-reliance on partisan data sources she knew to be unreliable and undependable, elevating dubious data over historical evidence, documented surveys, and scientific, evidence-based, empirically-sound advice from experienced scholars, such as eminent Stanford Professor John Ioannidis. Dissident or different opinions were excluded or precluded; reliable and documented data ignored; historical evidence and practice abdicated; and democratic means of decision-making eviscerated.

## COUNT ONE: 42 USC 1983

### (Violation of First, Fourth and Fourteenth Amendment Rights)

37. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

38. The First Amendment to the United States Constitution provides "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

39. The First Amendment's guarantees of freedom of speech, freedom of the press, freedom of assembly, and freedom to petition for redress of grievances are applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution.

40. Under 42 U.S.C. § 1983, every person who, under color of state law, subjects any citizen of the United States to the deprivation of "rights, privileges, or immunities secured by the Constitution and laws," shall be liable to the injured party.

41. As the Supreme Court acknowledged in the only case in American history that has any degree of parallel to the Governor's Orders, *Korematsu*, the test for the Governor's actions are whether her order meets the strictest scrutiny under the law: whether her order imposes limitations narrowly tailored to a compelling public interest. 323 U.S. 214.

42. Assuming the public interest is prevention of serious disease and death, the Governor's Order fails to narrowly tailor her restrictions on Michiganders' liberty to substantially reduce the risk of disease or death, and, in fact, many aspects of her order increase the risk of injury or death far more than they reduce those risks, while restraining far more liberty than necessary to achieve any real reduction in public risk.

43. The Governor ignored the many far less restrictive means available to her, including the past historical methods of quarantining the ill or those with reasonable suspicion of carrying transmittable disease, limiting mass gatherings in confined quarters, social distancing protocols, and protection of the most vulnerable at nursing homes, long-term care facilities, and in hospitals. Instead, the Governor's actions have hospitals laying off or furloughing staff, nursing homes with less ability to function safely and residents more confined to their quarters where they are most exposed. The Governor has sacrificed the public economy, civil liberties, and state of mind for her extraordinary experiment in converting the quarantining of the sick to a mass house arrest of the healthy.

44. The Governor's orders deprive the Plaintiffs of their ability to attend church, assemble safely and publicly for purposes of political protest or petitioning, travel within the state,

associate with whom they choose in their own homes, and have their freedom of physical movement restrained by the state, as a form of house arrest in their own homes, without reasonable suspicion or probable cause that they committed any crime or present any imminent risk of harm to self or others.

45. As a direct and proximate result of the Governor's violation of the First, Fourth and Fourteenth Amendments as set forth in this Complaint, Plaintiffs suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief.

46. Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their constitutional rights.

47. Plaintiffs are therefore entitled to declaratory and permanent injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202.

## COUNT TWO: 42 USC 1983

### Violation of the Takings Clause—42 U.S.C. §1983

48. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

49. The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. Amend. V.

50. The Takings Clause "is designed not to limit the governmental interference with property rights per se, but rather to secure compensation in the event of otherwise proper interference amounting to a taking." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536–37 (2005) (quoting *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 315 (1987) (emphasis in original)).

51. The Takings Clause bars government actors "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

52. Governor Whitmer issued the COVID-19 closure Orders as a means of slowing the spread of the novel coronavirus. Governor Whitmer has acted under color of state law, and the closure Orders were issued to serve a public purpose by a duly elected state official. Governor Whitmer's Orders adversely impacted Plaintiffs' use of their tangible property to such an extent that, at least temporarily, the Orders entirely diminished the economically beneficial use of that property.

53. During the indefinite period of shutdown, the Orders prohibit all economically beneficial and profitable uses of Plaintiff's tangible property; save bare ownership, the entire bundle of property rights was extinguished.

54. Orders 2020-21 and 2020-42 make it commercially impracticable to use the property belonging to Plaintiffs for any economically beneficial purpose, and inflict very nearly the same effect for constitutional purposes as appropriating or destroying [the property as a whole]. *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 455, (2009)

55. The Takings Clause "is designed not to limit the governmental interference with property rights *per se,* but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." *Lingle*, 544 U.S. at 536–37 (quoting *First English Evangelical Lutheran Church of Glendale,* 482 U.S. at 315 (emphasis in original)).

56. The Takings Clause bars government actors "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong*, 364 U.S. at 49.

11

57. Governor Whitmer issued 2020-21 and 2020-42 as a means of slowing the spread of the novel coronavirus. Governor Whitmer acted under color of state law, and Orders 2020-21 and 2020-42 were issued to serve a public purpose by a duly elected state official and his designee.

58. Orders 2020-21 and 2020-42 adversely impacted Plaintiffs' use of their tangible property to such an extent that, at least temporarily, the Orders entirely diminished the economically beneficial use of those properties.

59. Under Orders 2020-21 and 2020-42, Plaintiffs have been deprived of *all* economically beneficial and profitable uses of their tangible property and the benefit of owning their property; save bare ownership, the entire bundle of property rights was extinguished.

60. Orders 2020-21 and 2020-42 require physical locations housing "non-critical infrastructure" businesses, or those used as second homes or vacation homes to remain idle.

61. Order 2020-42 prohibits the affected properties from being leased, subleased, bought, sold or used for other purposes.

62. The Supreme Court "recognized that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster—and that such 'regulatory takings' may be compensable under the Fifth Amendment." *Lingle*, 544 U.S. at 537.

63. "The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415–16 (1922).

64. Governor Whitmer's executive Orders "go too far" and must "be recognized as a taking." *See id*.

65. Otherwise, without just compensation guaranteed by the Takings Clause, the plaintiffs

will be privately saddled with the cost of paying for government action undertaken for the common good.

66. Plaintiffs have suffered a complete loss of "*all* economically beneficial uses" of their property while Order 2020-42 remains in effect. This complete loss constitutes a categorical taking, whether it be Plaintiffs' inability to operate their businesses at their physical locations or their inability to exercise any of their other property rights with regard to their tangible property. *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992).

67. Plaintiffs have been called upon to sacrifice all usage of their property in the name of the common good, that is, to leave their property economically and otherwise idle, and for this, they have suffered a taking. *Lucas*, 505 U.S. at 1019.

68. In the alternative, under the framework articulated by the Supreme Court in *Penn Central*, Order 2020-42 constitutes a taking based upon "the magnitude of [the Orders'] economic impact and the degree to which [the Orders] interfere[] with legitimate property interests." *Lingle*, 544 U.S. at 540; *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124 (1978).

69. The Supreme Court's analysis in *Penn Central* sets forth the framework for assessing whether government action is considered a regulatory taking, identifying "several factors that have particular significance." 438 U.S. at 124.

70. The court looks to three factors when analyzing a taking: (1) "[t]he economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action," *Id*. While these factors provide "important guideposts," "[t]he Takings Clause requires careful examination and weighing of all the relevant circumstances." *Palazzolo v. Rhode Island,* 533

U.S. 606 at 617, (2001); *see also Tahoe– Sierra,* 535 U.S. at 321, 122 S.Ct. 1465 (whether a taking has occurred "depends upon the particular circumstances of the case"); *Yee v. City of Escondido,* 503 U.S. 519, 523, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) (regulatory takings claims "entail[ ] complex factual assessments"). *Lost Tree Vill. Corp. v. United States*, 115 Fed. Cl. 219, 228 (2014) (emphasis added).

71. Even if the regulation falls short of eliminating all economically beneficial use, a taking nonetheless may have occurred, *Palazzolo*, 533 U.S. at 617.

72. Since the onset of Governor Whitmer's Orders, Plaintiffs have not been permitted to use their physical locations to operate their businesses, nor have they been allowed to use their tangible property for any economically profitable use.

73. Orders 2020-21 and 2020-42 have either entirely drained Plaintiff's property of all economic value during their pendency, or have nearly done so; in either event, the diminution of value and government interference caused by these Orders is an unconstitutional taking without just compensation.

## COUNT THREE: 42 USC 1983

### Interference With Property Interests

74. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

75. Never in the modern history of the United States – even in war time – has such an invasive action striping citizens of fundamental rights been taken by a government order.

76. The Plaintiffs have a protected liberty interest in their right to live without arbitrary governmental interference in their fundamental property right to use and enjoy land in which they hold a recognized interest. *See MFS, Inc. v. DiLazaro,* 771 F. Supp. 2d 382, 440–41

(E.D. Pa. 2011) (*citing DeBlasio v. Zoning Bd. of Adjustment for Twp. of W. Amwell,* 53 F.3d 592, 600 (3d Cir.1995)); *see also Horne*, 576 U.S. 350, 135.

77. The Supreme Court "ha[s] emphasized time and again that "[t]he touchstone of due process is protection of the individual against arbitrary action of government[.]" *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (quoting *Wolff v. McDonnell,* 418 U.S. 539, 558 (1974)).

78. "[T]he fault [may] lie[] in a denial of fundamental procedural fairness … or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective[.]" *Id*. at 845-846 (citations omitted).

79. "'[S]ubstantive due process prevents the government from engaging in conduct that 'shocks the conscience,' ... or interferes with rights 'implicit in the concept of ordered liberty[.]'" *United States v. Salerno,* 481 U.S. 739, 746 (1987) (quoting *Rochin v.California,* 342 U.S. 165,172 (1952), and *Palko v. Connecticut,* 302 U.S. 319, 325–326 (1937)).

80. "[T]he substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Lewis*, 523 U.S. at 847 (quotations omitted).

81. Orders 2020-21 and 2020-42 as set forth above, constitute arbitrary, capricious, irrational and abusive conduct which unlawfully interferes with Plaintiffs' liberty and property interests protected by the due process clause of the Fourteenth Amendment to the United States Constitution.

82. Governor Whitmer has acted under color of state law with the intent to unlawfully deprive the Plaintiffs of their liberty and property without substantive due process in violation of the Fourteenth Amendment to the United States Constitution.

83. Governor Whitmer's actions, including issuance and enforcement of 2020-21 and 2020-42 constitute the official policy, custom, and practices of the State of Michigan.

84. Orders 2020-21 and 2020-42 intrude upon the Plaintiffs' use and enjoyment of their property and separately impacts upon the use of their tangible property. *See DeBlasio,* 53 F.3d at 601. Therefore, Governor Whitmer has violated Plaintiffs' substantive due process rights. *See also Nashville, C. & St. L. Ry. v. Walters*, 294 U.S. 405, 415 (1935).

85. Governor Whitmer has arbitrarily, irrationally and capriciously imposed upon Plaintiffs' use and enjoyment of their property by, *inter alia*, requiring both Plaintiffs to shutdown indefinitely and to privately bear the burden for such publicly beneficial decisions, which are aimed at slowing the spread of the novel coronavirus. *See DeBlasio,* 53 F.3d at 601.

86. Governor Whitmer's behavior does not comport with traditional ideas of fair play and decency, *Breithaupt v. Abram,* 352 U.S. 432, 435 (1957), shocks the conscience and violates the 'decencies of civilized conduct.'" *See Lewis*, 523 U.S. 833, 846–47 (citations omitted); and, thereby, violates Plaintiffs' Substantive Due Process Rights.

87. Governor Whitmer has acted intentionally, willfully, wantonly, and with callous and reckless disregard for Plaintiffs' constitutional rights.

88. As a direct and proximate result of Governor Whitmer's Executive Orders, Plaintiffs have and will continue to sustain monetary damages including loss in the value of the tangible property and physical locations, lost revenues, profits, expenses, attorneys' fees, and other costs incurred.

## COUNT IV: 42 U.S.C. §1983

### Interference With Right To Travel & Associate

89. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

90. The Plaintiffs have a right to be free from intrusion into their familial relationships and the fundamental freedom of their right to associate. *Roberts v. United States Jaycees*, 468 U.S. 609 (1984). Moreover, the constitutional shelter afforded such relationships reflects the realization that individuals draw much of their emotional enrichment from close ties with others. Protecting these relationships from unwarranted state interference therefore safeguards the ability independently to define one's identity that is central to any concept of liberty. *Id* at 619. Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life. *Id* at 619-620.

91. As a result of the Order, Plaintiffs have been denied their right guaranteed by the United States Constitution to travel, including from their main residence in Grosse Pointe Farms to their vacation home on Torch Lake.

92. As early as the Articles of Confederation, we recognized freedom of movement (Article 4), as so fundamental it did not need express protection, including naturally under the Privileges and Immunities clause of the Constitution, amongst other provisions.

93. Freedom of movement has been judicially recognized as a fundamental Constitutional right ever since *Corfield v. Coryell*, 6 Fed. Cas. 546 (1823).

94. The Plaintiffs have a protected liberty interest in their right to associate with their

friends, family and significant others without arbitrary governmental interference. *Loving* v. *Virginia*, 388 U.S. 1 (1967).

95. The Supreme Court has emphasized time and again that the touchstone of due process is protection of the individual against arbitrary action of government. *Lewis*, 523 U.S. at 845 (quoting *Wolff v. McDonnell,* 418 U.S. 539, 558 (1974)). The fault may lie in a denial of fundamental procedural fairness … or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective. *Id* at 845-846 (citations omitted).

96. Choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. *Roberts v. United States Jaycees*, 468 U.S. 609, 617-618 (1984).

97. This Court has long recognized that freedom of personal choice in matters of family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment. *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639-640, (1974) see also *Loving*, 388 U.S. at 12; *Griswold* v. *Connecticut*, 381, U.S. 479; *Pierce* v. *Society of Sisters*, 268 U.S. 510; *Meyer* v. *Nebraska*, 262 U.S. 390.

98. The test for a substantive-due-process right is twofold: whether the right is "objectively, deeply rooted in this Nation's history and tradition" and whether "the crucial guideposts" of "[o]ur Nation's history, legal traditions, and practices" support the right. The fundamental rights recognized under substantive due process include "personal decisions relating to marriage . . . family relationships, child rearing, and education," which often

18

"involv[e] the most intimate and personal choices a person may make in a lifetime." *Fakoya v. County of Clark*, 2014 U.S. Dist. LEXIS 143240, 13-14, 2014 WL 5020592.

99. Orders 2020-21 and 2020-42, as set forth above, constitute arbitrary, capricious, irrational and abusive conduct which unlawfully interferes with Plaintiffs' liberty and the right to associate with friends and family, as well as their right to travel, as protected by the due process clause of the Fourteenth Amendment to the United States Constitution.

100. Governor Whitmer has acted under color of state law with the intent to unlawfully deprive the Plaintiffs of their liberty and property without substantive due process in violation of the Fourteenth Amendment to the United States Constitution.

101. Governor Whitmer's actions, including issuance and enforcement of Orders 2020-21 and 2020-42 constitute the official policy, custom, and practices of the State of Michigan. Therefore, Governor Whitmer has violated the Plaintiffs' substantive due process rights.

102. Governor Whitmer has acted intentionally, willfully, wantonly, and with callous and reckless disregard for Plaintiffs' constitutional rights.

103. As a direct and proximate result of Governor Whitmer's Executive Orders, the Plaintiffs have and will continue to sustain damages including attorneys' fees and other costs incurred.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs ask this Court:

A. To issue a preliminary injunction, and ultimately a permanent injunction, restraining Governor Whitmer, her officers, agents, servants, employees, and attorneys, and any persons in active concert or participation with them, from enforcing or complying with Orders 2020-21 and 2020-42.

    B.  To enter a judgment declaring that Orders 2020-21 and 2020-42 violate the First, Fourth, Fifth and Fourteenth Amendments to the U.S. Constitution.

    C.  To award Plaintiffs compensatory damages in the amount owed as just compensation for the regulatory taking of their physical location and tangible property;

    D.  To award Plaintiffs compensatory damages in the amount owed as just compensation for Governor Whitmer's violations of the Due Process Clause of the Fourteenth Amendment;

    E.  To award Plaintiffs their attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and

    F.  To grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

BARNES LAW, LLP

_____
Robert E. Barnes, CA SBN #235919
*Admitted Pro Hac Vice*
601 South Figueroa Street, Suite 4050
Los Angeles, CA 90017
(310) 510-6211 – Main
(310) 510-6225 – Fax
robertbarnes@barneslawllp.com
*Attorneys for Plaintiffs*